**Case No. 24-3311**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

**DENNIS WIERTELLA**

*Plaintiff - Appellee*

v.

**LAKE COUNTY, OH**

Defendant

**DIANA SNOW, RN; CHRISTINA WATSON, RN**,
in their individual and official capacities

*Defendants – Appellants*

On Appeal from the United States District Court
for the Northern District of Ohio
Case No. 1:20-cv-2739

---

**APPELLANTS DIANA SNOW AND CHRISTINA WATSON'S PETITION
FOR REHEARING AND FOR REHEARING EN BANC**

---

Amily A. Imbrogno (0092434)
David M. Smith (0079400)
**MEYERS, ROMAN, FRIEDBERG & LEWIS**
28601 Chagrin Boulevard, Suite 600
Cleveland, OH 44122
Phone: (216) 831-0042/Fax: (216) 831-0542
aimbrogno@meyersroman.com
dsmith@meyersroman.com

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES .......................................................................... ii

RULE 35 STATEMENT OF COUNSEL ........................................................ 1

STATEMENT OF FACTS .............................................................................. 4

    A.    Nurse Watson's only involvement with Wiertella's care.......... 6

    B.    Nurse Snow's only involvement with Wiertella's care............ 7

STATEMENT OF PROCEDURE ................................................................... 7

ARGUMENTS AND AUTHORITIES ........................................................... 9

    THE PANEL DISREGARDED EXISTING PRECEDENT TO
    HOLD THAT A JURY COULD FIND THAT NURSE WATSON
    AND NURSE SNOW WERE AWARE OF A SUBSTANTIAL
    RISK OF HARM TO WIERTELLA, STRIPPING THEM OF
    QUALIFIED IMMUNITY .................................................................... 9

    THE PANEL CREATED A CIRCUIT SPLIT WHEN IT HELD
    THAT THE CONSTITUTIONAL RIGHT TO IMMEDIATE
    ACCESS TO REQUESTED MEDICATION WAS CLEARLY
    ESTABLISHED ...................................................................................... 11

CONCLUSION .............................................................................................. 13

CERTIFICATE OF COMPLIANCE ............................................................. 14

CERTIFICATE OF SERVICE ...................................................................... 15

APPENDIX .................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

*Brawner v. Scott Cnty.,* 18 F.4th 551, 556 (6th Cir. 2001) ....................................2,3

*Carter v. Boward Cnty. Sheriff's Off.,* 710 F.App'x 387, 392 (11th Cir. 2017) ................................................................................................ 2,12

*Duncan v. Corr. Med. Servs.,* 451 F.App'x 901, 905 (11th Cir. 2012) .............. 2,12

*Farmer v. Brennan,* 511 US 825 (1994).............................................. 1,3,8,9,11,12

*Haltiwanger v. Mobley,* 230 F.3d 1363 (8th Cir. 2000) ..................................... 2,12

*Helphenstine v. Lewis Cnty.,* 60 F.4th 305 (6th Cir. 2023)........................................3

*Jackson v. Pollion*, 733 F.3d 786, 787 (7th Circuit)........................................... 2,12

*King v. Busby,* 162. F.App'x 669, 671 (8th Cir. 2006)....................................... 2,12

*Kingsley v. Hendrickson*, 576 US 389 (2015)...........................................................3

*Lawler ex rel. Lawler v. Hardeman County*, 93. F.4th 919, 928-30 (6th Cir. 2024) ................................................................................................ 1,3,8,9

*Lindwurm v. Wexford Health Sources, Inc.,* 84 F.App'x 46, 48 (10th Cir. 2003) ................................................................................................ 2,12

*Pandey v. Freedman,* 66 F.3d 306, 1995 WL 568490 (5th Cir. 1995).............. 2,12

*Richmond v. Huq,* 885 F.3d 928 (6th Cir. 2018) .......................................................8

*Westmoreland v. Butler Cnty.,* 35 F.4th 1051 (6th Cir. 2022) ...................................3

4934-2593-1348, v. 1

## RULE 35 STATEMENT OF COUNSEL

The panel's opinion deviated from the precedent of the Supreme Court of the United States and this Circuit in holding that under the Eighth Amendment, the liability imposed on a medical professional working in a corrections setting turns on what that professional <u>should have</u> known, rather what she <u>did</u> know. This contradicts the Supreme Court's holding in *Farmer v. Brennan*, 511 US 825 (1994) which requires that Appellee prove that Appellants Snow and Watson had "actual knowledge of [a] risk" and disregard it. It also contradicts this Court's clearly established precedent set forth in *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 928-30 (6th Cir. 2024)[1], which requires proof that 1. Snow and Watson <u>knew</u> the facts that created the risk to his decedent, 2. they also interpreted those facts to conclude for themselves that the risk existed, and 3. their response to this <u>known risk</u> was unreasonable.

The panel's opinion could be read to provide that a convicted prisoner may defeat qualified immunity at the summary judgment stage solely based on a delay in

---

[1] While *Lawler* involved the death of a pretrial detainee instead of the death of a convicted prisoner, it analyzed the plaintiff's Fourteenth Amendment claims under the "deliberate indifference" standard that this Court used to apply to claims brought by pretrial detainees under the Fourteenth Amendment. That standard was the same standard that still applies to claims brought by convicted prisoners under the Eighth Amendment and therefore remains good law to the extent that it describes the test to be applied to the subjective element of an Eighth Amendment claim.

1

receiving medicine.  This not only creates a circuit split (contradicting *King v. Busby*, 162 F.App'x 669, 671 (8th Cir. 2006); *Haltiwanger v. Mobley*, 230 F.3d 1363 (8th Cir. 2000); *Lindwurm v. Wexford Health Sources, Inc.*, 84 F.App'x 46, 48 (10th Cir. 2003); *Carter v. Boward Cnty. Sheriff's Off.*, 710 F. App'x 387, 392 (11th Cir. 2017); and *Duncan v. Corr. Med. Servs.*, 451. F.App'x 901, 905 (11th Cir. 2012); *Jackson v. Pollion*, 733 F.3d 786, 787 (7th Circuit); *Lindwurm v. Wexford Health Sources, Inc.*, 84 F. App'x 46, 48 (10th Cir. 2003); *Pandey v. Freedman*, 66 F.3d 306, 1995 WL 568490, at *2 (5th Cir. 1995)); but also involves a matter of exceptional importance.

Between 2008 and 2021, approximately 16.7 percent of the courts of appeals' civil dockets consisted of "prisoner civil rights" and "prison condition" claims - and up to a quarter of such claims involved medical treatment – while studies suggest that 91 percent of jails holding 1,000 inmates or more have been sued by an inmate concerning medical care.  *Brawner v. Scott Cnty.*, 18 F.4[th] 551, 556 (6th Cir. 2001) (C. Readler, dissenting), citing Federal Judicial Center, IDB Appeals 2008-present, https://www.fjc.gov/research/idb/interactive/21/IDB-appealssince-2008 (last visited Dec. 1, 2021); Inmate Litigation, 116 Harv. L. Rev. 1555, 1570-71 nn.47 & 48 (2003); and Pew Charitable Trusts, Jails: Inadvertent Health Care Providers, at 9 (Jan. 2018). Allowing convicted prisoners to overcome qualified immunity at summary judgment simply due to a delay in receiving medication could dramatically increase these numbers.

Finally, since *Brawner v. Scott County*, 18 F.4th 585 (6th Cir. 2021), considerable confusion has developed in this Circuit regarding the standard district courts must apply in medical-treatment cases involving pretrial detainees. *Westmoreland v. Butler Cnty.*, 35 F.4th 1051, 1051 - 1052 (6th Cir. 2022) (J. Bush, dissenting).  In *Brawner*, this Court modified the subjective prong of the deliberate indifference standard under the Fourteenth Amendment in light of *Kingsley v. Hendrickson*, 576 US 389 (2015).[2] In *Helphenstine v. Lewis Cnty.*, 60 F.4th 305 (6th Cir. 2023), this Court further interpreted *Brawner* to lower the *Farmer* standard from actual knowledge to mere recklessness.

By focusing on what Snow and Watson should have or could have known – rather than what the evidence shows they <u>actually</u> knew - the panel applies the same standard to cases involving pretrial detainees (who are presumed innocent) and cases involving convicted prisoners.  It would be prudent for this Court to address and correct the panel's application of *Farmer* and *Lawler* to prevent similar and further confusion regarding the Eighth Amendment Standard in this Circuit.

/s/ *Amily A. Imbrogno*
Attorney of Record for
Appellants-Defendants
Diana Snow and Christina Watson

---

[2] *Kingsley* analyzed excessive force claims, not claims regarding medical needs.

4934-2593-1348, v. 1

## STATEMENT OF FACTS

In the early morning of Sunday, December 2, 2018, police pulled Randy Wiertella over on I-90 west for two traffic violations.  The police officers found several guns in the car, loose ammunition, two Outlaw Motorcycle Club vests and some cocaine. (RE 57-2, PageID #1092.) Wiertella was arrested and charged with possession of cocaine and improper transport of a firearm.  (RE 61, PageID #2520.) He was booked "without meds" into the Lake County Jail.  (RE 59, PageID # 269.)

At booking, a jail officer recorded his observations about Wiertella's appearance and questioned Wiertella about his medical history, marking responses on the medical screening form as Wiertella watched.  (Longbons, RE 60, PageID #2085-2098; #2275-2277.)  The booking officer noted no obvious pain, bleeding or other symptoms that suggested a need for emergency medical services.  He saw no visible signs of trauma or illness requiring physician care.  Wiertella reported that he was taking medications for diabetes, heart disease, high blood pressure and psychiatric disorder(s).  He denied taking insulin, but he reported following a diabetic diet. He also reported that he was on medication which should be continuously administered or available, though the medications and dosing instructions were not specified on the form.  "No" was circled in response to questions about the last time Wiertella saw his doctor and the doctor's contact information.  Finally, Wiertella mentioned that he suffered from sleep apnea and "no

4

immune/MRSA." (Longbons, RE 60, PageID #2088; #2115, #2117. #2276.) Wiertella and the booking officer signed the completed form and the officer deposited it into a wall file for medical staff to retrieve. (Longbons, RE 60, PageID #2098, #2105, #2117.)

Wiertella submitted a second request form on December 3, 2018 asking for "Prilosec 20 m, Saralitrlean 200 m, Lasics, Efonefaron, Simicoton," the last three of which he described as "blood presher meds." [3] (Det. Kelley, RE 61, PageID #2552.) On December 5, 2018, Wiertella submitted a third and final request form for "Meds: metformin, Prilosec, Saralitolen, eforneferon, lasices, semecota," the last three of which he described as "blood presher and water pills." He also wrote: "Call Wasau VA to get full list of meds or my meds ship." (Det. Kelley, RE 61, PageID #2595.) Neither request reflects a response from the dispensary. Nurse Watson did not see either form, and we do not know who in the dispensary saw them. (Watson, RE 59, PageID #1276.) According to Nurse Snow, "any of the nurses on first or second shift [were] supposed to answer the request forms, and we tried to get that done within 24 hours." (Snow I, RE 63, PageID #2710.)

At 2:43 a.m. on December 10, 2018, a corrections officer saw Wiertella lying on his back on the cell floor, motionless. (Det. Kelley, RE 61, PageID #2506.) The

---

[3] No one knows what medications Wiertella was referring to when he requested "efonefaron" or "simicoton." (Arden, RE 65, PageID #2900.)

officer called the tower to open the cell door.  He felt for a pulse.  Finding none, the officer administered a sternal rub followed by chest compressions.  Other corrections officers reported to the cell with a defibrillator. At 2:55 a.m., paramedics arrived and took over CPR.  At 3:12 a.m., Wiertella was pronounced dead.  (Det. Kelley, RE 61, PageID #2506, #2497.)

### A. Nurse Watson's only involvement with Wiertella's care

Appellant Christina Watson, LPN's ("Nurse Watson") involvement with Wiertella's medical care in the jail was minimal. She received, reviewed and signed Wiertella's screening form on Sunday, December 2, 2018.  (Det. Kelley, RE 61, PageID #2591; Watson, RE 59, PageID #1264, #1266.)   Her chart notes from December 3, 2018 reflect: "Inmate states he is diabetic and takes metformin 1000 mg BID." That same day, she ordered a "diabetic diet with BS [blood sugar] check QHS [each evening].  Metformin 1000 mg BID [twice daily]."  (Det. Kelley, RE 61, PageID #2591; Watson, RE 59, PageID #1269.)  Also on December 3, 2018, the dispensary received an inmate request from Wiertella for "diabetic, and other meds." Nurse Watson replied to the form: "Diabetic diet and metformin ordered."  (Det. Kelley, RE 61, PageID #2596.)    At some point, Nurse Watson also entered Wiertella's name into the dispensary's appointment book for a sick call visit with a

6

nurse on December 10, 2018 for "BP check/sign release."[4]  (Snow II, RE 64, PageID #2860-2861, #2874.)

This was the entirety of Nurse Watson's involvement with Wiertella's medical care.

### B. Nurse Snow's lack of involvement with Wiertella's care

Nurse Snow was Nurse Watson's supervisor, but she never interacted with Wiertella.  (Watson, RE 59, PageID # 25:17-18.) She did not evaluate him clinically, she was not asked for input about his medical condition, she never reviewed his chart and she did not even know that he was an inmate.  (Snow I, RE 63, PageID #88:6-24.)

### STATEMENT OF PROCEDURE

Despite Nurse Watson's limited involvement in Wiertella's medical care - and Nurse Snow's complete lack of involvement - Appellee filed a complaint in the District Court on December 9, 2020 naming them, among others, as Defendants and alleging they were liable for Wiertella's death.  On February 10, 2021 Plaintiff filed an Amended Complaint alleging the following:

- claims under 42 USC § 1983 for deliberate indifference to Wiertella's serious medical needs, under the Fourteenth and Eighth Amendments, against Lake

---

[4] The district court found, in error, that there was no evidence that Nurse Watson scheduled Wiertella for sick call or determined that he was scheduled for a sick call. Opinion, Doc 77, PageID #5988-5989. That conclusion was simply not supported by the record.

County, its Sheriff and jail administrator, several employees of the Lake County Sheriff's Office, the jail doctor, and Nurse Snow and Nurse Watson;

- claims for negligence against Lake County, the Sheriff, jail administrator, and corrections officers; and,

- claims for wrongful death against Lake County, the Sheriff, jail administrator, and corrections officers.

Shortly before the dispositive motion stage, Appellee voluntarily dismissed several defendants. The District Court granted summary judgment to, and dismissed all claims against, Lake County, the jail administrator, the remaining corrections officer Defendant, and the jail doctor.

The District Court denied summary judgment to Nurse Snow and Nurse Watson.  Despite their minimal or non-existent involvement in Wiertella's care, it denied them qualified immunity, holding that Wiertella had a constitutional right to receive immediate action in response to his request for hypertension medication and that the right had been clearly established by *Richmond v. Huq*, 885 F.3d 928 (6th Cir. 2018).  Nurse Snow and Nurse Watson filed this interlocutory appeal, but the panel upheld the district court's decision, improperly contradicting the well-established precedent set in *Farmer v. Brennan*, 511 US 825 (1994) and *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 928-30 (6th Cir. 2024), while creating a circuit split and inviting confusion regarding Eighth Amendment standards.

## ARGUMENT AND AUTHORITIES

### THE PANEL DISREGARDED EXISTING PRECEDENT TO HOLD THAT A JURY COULD FIND THAT NURSE WATSON AND NURSE SNOW WERE AWARE OF A SUBSTANTIAL RISK OF HARM TO WIERTELLA, STRIPPING THEM OF QUALIFIED IMMUNITY

This Court must grant en banc review to correct the panel's finding that Nurse Watson and Nurse Snow were subjectively aware of a substantial risk to Wiertella based on their knowledge that failure to continuously receive medications and experiencing high blood pressure could create some general risk to a patient inmate. There is just no evidence on the record that Nurse Watson or Nurse Snow were subjectively aware of the risk of immediate harm to Wiertella.

Per *Farmer v. Brennan*, 511 US 825 (1994), a court or trier of fact may rely on circumstantial evidence to find that a defendant had actual knowledge of the risk of harm to a convicted prisoner. Yet, the Supreme Court clearly provided in *Farmer* that circumstantial evidence can only be sufficient to prove actual knowledge when risks are "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" and that the defendant "had been exposed to information concerning the risk" such that she "must have known of it." *Farmer*, 511 US at 842.

Moreover, this Court recently held in *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 928-30 (6th Cir. 2024) that the subjective prong requires proof that 1. Snow and Watson <u>knew</u> the facts that created the risk to his decedent, 2. they

9

also interpreted those facts to conclude for themselves that the risk existed, and 3. their response to this <u>known risk</u> was unreasonable.

The panel found that that Nurse Watson was aware that Wiertella required some medication be continuously administered and that generally, there could be serious medical consequences if a person is non-compliant with medications.  It also cited Nurse Snow's testimony that she was aware that there are situations in which untreated high blood pressure could cause substantial risk of harm to a patient. Essentially, this general knowledge was enough to convince the majority of the panel that the nurses must have known that Wiertella was subject to an immediate risk.

However, the majority of the panel's decision ignores the Court's holding in *Lawler* requiring that it find that Nurse Watson and Nurse Snow <u>knew</u> of <u>facts</u> that created a risk to Wiertella, <u>and</u> that they actually interpreted those facts to <u>conclude for themselves</u> that the risk existed. The panel found that Nurse Watson and Nurse Snow could be held liable just because they possessed general knowledge that non-compliance with medications and high blood pressure could present risks to medical patients.

Ultimately, the panel's decision renders the standard for proof a violation of the Constitution as practically the same standard of proof for a garden variety malpractice claim. By doing so, the panel ignores the Supreme Court's instruction that "an official's failure to alleviate a significant risk that he should have perceived

10

but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 US at 838.

### THE PANEL CREATED A CIRCUIT SPLIT WHEN IT HELD THAT THE CONSTITUTIONAL RIGHT TO IMMEDIATE ACCESS TO REQUESTED MEDICATION WAS CLEARLY ESTABLISHED

The majority of the panel held that the District Court properly concluded that Nurse Watson was aware of a substantial risk to Wiertella if he did not timely receive his essential medications, "yet Watson did nothing to ensure that Wiertella received his blood-pressure medications – or any medication other than for his diabetes – in a timely manner. This was unreasonable." However, neither the District Court nor the panel define the term "timely."

Here, Wiertella requested blood pressure medications on December 3 and was found unresponsive on December 10. Thus, the panel has created precedent establishing that an official acts unreasonably – and can be liable for a violation of the Eighth Amendment – if she does not ensure that an inmate receives a medication within seven days of his request, absent any other knowledge of the inmate's condition. This new standard is far different than standards established by other circuit courts of appeals.

As well-explained by the panel's dissenting opinion, other circuit courts find liability only when the deprivation of blood pressure is, unlike in this case, repeated, prolonged, intentional, or accompanied by overt signs of an impending and serious

hypertensive crisis – correctly applying the Supreme Court's instructions in *Farmer*. See *King v. Busby*, 162 F.App'x 669, 671 (8th Cir. 2006); *Haltiwanger v. Mobley*, 230 F.3d 1363 (8th Cir. 2000); *Lindwurm v. Wexford Health Sources, Inc.*, 84 F.App'x 46, 48 (10th Cir. 2003); *Carter v. Boward Cnty. Sheriff's Off.*, 710 F. App'x 387, 392 (11th Cir. 2017) (liability for "regularly" denying medication for five months, despite inmate complaints and symptoms); and *Duncan v. Corr. Med. Servs.*, 451. F.App'x 901, 905 (11th Cir. 2012) (liability for depriving inmate of three different heart medications for periods totaling 22 days, 210 days, and 46 days respectively, despite his repeated requests and trips to the emergency room with chest pain).

Additionally, other circuits have faced similar blood pressure medication claims, and have approved of treatment decisions like those of the Appellants. See, e.g., *Jackson v. Pollion*, 733 F.3d 786, 787 (7th Circuit) (no liability for three-week delay); *Lindwurm v. Wexford Health Sources, Inc*., 84 F. App'x 46, 48 (10th Cir. 2003) (order) (no liability for "isolated and brief" "lapses in [providing blood pressure] medication"); *Pandey v. Freedman,* 66 F.3d 306, 1995 WL 568490, at *2 (5th Cir. 1995) (unpublished table decision) (per curiam) (no liability for providing wrong blood pressure medication four days late); see also *Duncan v. Corr. Med. Servs.,* 451 F. App'x 901, 905 (11th Cir. 2012) (per curiam) (noting that "an isolated instance where [the inmate] had not received proper [blood pressure] medication and

then suffered a medical emergency" would "clearly" support "no showing of deliberate indifference").

## CONCLUSION

This Court should grant rehearing and rehearing en banc of this appeal to clarify the standards that apply to Eighth Amendment deliberate indifference claims, to resolve a circuit split, and to ensure that the standards in this Circuit reflect well-settled Supreme Court precedent.

Respectfully submitted,

*/s/Amily A. Imbrogno*
Amily A. Imbrogno (0092434)
David M. Smith (0079400)
**MEYERS, ROMAN, FRIEDBERG & LEWIS**
28601 Chagrin Boulevard, Suite 600
Cleveland, OH 44122
Phone: (216) 831-0042
Fax: (216) 831-0542
aimbrogno@meyersroman.com
dsmith@meyersroman.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that the word count is 2,882 using proportionally spaced Times New Roman, 14-point font, in Microsoft Word for Mac format.

/s/*Amily A. Imbrogno*
Amily A. Imbrogno, Esq.

*Counsel for Appellants Snow
and Watson*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Appellants Diana Snow and Christina Watson's Petition for Rehearing and for Rehearing En Banc was served on all counsel of record via the Court's electronic filing system this 9TH day of July, 2025.

/s/*Amily A. Imbrogno*
Amily A. Imbrogno (0092434)

*Counsel for Appellants Snow and Watson*

# APPENDIX

*Dennis Wiertella v. Lake County, Ohio et al.,* June 24, 2025 published opinion

4934-2593-1348, v. 1

## UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

Kelly L. Stephens
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: June 24, 2025

Ms. Kathleen M. Minahan
Meyers, Roman, Friedberg, & Lewis
28601 Chargrin Boulevard
Suite 600
Cleveland, OH 44122

Mr. Daniel P. Petrov
Thorman Petrov Group
20046 Walker Avenue
Shaker Heights, OH 44122

Re:  Case No. 24-3311, *Dennis Wiertella v. Lake County, OH, et al*
Originating Case No. : 1:20-cv-02739

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Sandy Opacich

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0167p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DENNIS WIERTELLA, as father and administrator of the
estate of Randy Wiertella, deceased,

        *Plaintiff-Appellee,*

*v.*

        No. 24-3311

LAKE COUNTY, OHIO,

        *Defendant,*

DIANA SNOW, RN and CHRISTINA WATSON, RN, in
their individual and official capacities,

        *Defendants-Appellants.*

---

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:20-cv-02739—Bridget Meehan Brennan, District Judge.

Decided and Filed: June 24, 2025

Before: GILMAN, READLER, and BLOOMEKATZ, Circuit Judges.

---

## COUNSEL

**ON BRIEF:** Kathleen M. Minahan, MEYERS, ROMAN, FRIEDBERG, & LEWIS, Cleveland,
Ohio, for Appellants. Daniel P. Petrov, Sarah E. Wyss, THORMAN PETROV GROUP CO.,
LPA, Shaker Heights, Ohio, for Appellee.

GILMAN, J., delivered the opinion of the court in which BLOOMEKATZ, J., concurred.
READLER, J. (pp. 10–28), delivered a separate dissenting opinion.

No. 24-3311                    *Wiertella v. Lake Cnty., Ohio, et al.*                    Page 2

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge.    Randy Wiertella died in the Lake County Adult Detention Facility (the Jail) on the morning of December 10, 2018.  Dennis Wiertella, as the Administrator of the Estate of Randy Wiertella (the Estate), filed suit on behalf of the Estate. The Estate brought several claims, including a 42 U.S.C. § 1983 claim that Wiertella's constitutional rights under the Eighth and Fourteenth Amendments were violated by Jail staff Diane Snow, RN, and Christina Watson, LPN.

Snow and Watson filed a motion for summary judgment, seeking dismissal on the basis of qualified immunity.  The district court denied their motion.  For the reasons set forth below, we **AFFIRM** the decision of the district court and **REMAND** the case for further proceedings on the Estate's § 1983 claim.

### I. BACKGROUND

Wiertella was charged in Willoughby Municipal Court with the illegal possession of drugs and the improper transport of a firearm.  He was sentenced to 27 days in the Jail.  Wiertella was booked at the Jail on December 2, 2018 and underwent a medical screening as part of the booking process.  He entered the Jail without any of his medications, but a corrections officer recorded that Wiertella was taking medications for heart disease, diabetes, high blood pressure, and a psychiatric disorder.  These were "essential medications" under the Jail's policies and procedures.   The medical-screening form states that Wiertella's medications needed to be continuously administered.  Snow was the medical coordinator responsible for making sure that all inmate medical screens were reviewed.

Watson reviewed and signed Wiertella's medical-screening form on December 2, 2018. She was aware that Wiertella was booked without any medications and that Wiertella had been taking "essential medications" that needed to be continuously administered.   She initially testified that she was "sure" that she would have ordered diabetes medication and a diabetic diet

immediately after reviewing the medical-screening form. But she did not in fact order any medications on that date.

On December 3, Wiertella sent in an inmate-request form that asked for "diabetic, and other meds." Watson received this request. She wrote down that "Inmate states he is diabetic and takes Metformin 1000 mg BID." Watson testified that she had likely asked a booking officer to ask Wiertella how many milligrams of Metformin he took and how often. She said that Wiertella "had to have probably stated that he was on a thousand milligrams twice a day in order for me to order it such as that." The Jail doctor then signed off on Watson's order for diabetes medication and a diabetic diet.

Later that same day, Wiertella submitted another inmate-request form for five other medications, including blood-pressure medication. Wiertella made yet another request for blood-pressure medications two days after that. He also reminded the medical staff to call the Veterans Administration (VA) pharmacy in Wasau, Wisconsin to get his medication records.

Watson testified that she did not recall receiving any inmate-request forms from Wiertella. No one contacted the VA pharmacy or ordered any blood-pressure medication. Watson also testified that she prioritized Wiertella's "most important" medical condition, which was "him being a diabetic," and did not treat his other medical conditions. She said that this is what she was trained to do by Snow. But Watson conceded that there was nothing that prevented her from addressing Wiertella's other medical conditions. She testified that the Jail, however, preferred for inmates to get a friend or family member to bring in their medications because medications could be expensive for the Jail to order through the pharmacy.

Wiertella was eventually scheduled to have a sick call on December 10, 2018. But the record does not indicate when Wiertella was added to the sick-call log or which nurse added him. The sick-call log states that Wiertella needed to be seen for "BP check, no meds." Snow testified that this meant that Wiertella "need[ed] his blood pressure checked because he's got some sort of history of high blood pressure and he brought no meds in with him." There was also a scheduling book for sick calls that was set up by whichever nurse was working the evening

before. In the scheduling book, Watson wrote Wiertella's name and "BP check and sign release."

There is no explanation in the record for why Wiertella was not scheduled for a sick call until December 10. Nurse sick call was available every day of the week, including weekends, and doctor sick call was available on Mondays through Fridays. The medical-release form could be signed by an inmate during a nurse sick call, and nurses could usually verify medications with a pharmacy in less than ten minutes. Nurses were also able to "check anybody's blood pressure at any time" to determine if they had high blood pressure and needed medication.

Watson testified that if an inmate said he was on blood-pressure medication, she could decide that she did not need to verify the prescription with his pharmacy and could order the medication herself. She chose to do this with Wiertella's diabetes medication, but not with any of his other medications.

If an inmate was unable to provide his own medications, nurses could also put that inmate on the sick-call log to be evaluated by the doctor. Wiertella was never scheduled for a physical exam or for a review of his medical history. Nor was he ever seen by anyone who could prescribe medications.

Wiertella was found in his cell nonresponsive and pronounced dead at 3:12 a.m. on December 10, 2018. The Estate's expert, Dr. Jonathan Arden, concluded that Wiertella's cause of death was hypertensive cardiovascular disease. Dr. Arden testified that "the discontinuance and failure to provide medications contributed to [Wiertella's] blood pressure spiking and his risk of sudden death." He concluded in his report that "[b]ut for the failure to provide those medications and a CPAP machine, in my opinion, Mr. Wiertella would not have died how and when he did."

On appeal, Snow and Watson argue that the district court erred by denying their motion for summary judgment. They contend that they are entitled to qualified immunity because the caselaw has not "clearly established" that a medical employee at a jail violates an inmate's constitutional rights if she becomes aware that an inmate is on medication for a serious medical condition and then fails to ensure that the medication is timely obtained. In addition, Snow and

Watson argue that the court erred in finding that they subjectively appreciated a substantial risk of harm to Wiertella and that they failed to reasonably respond.

## II. ANALYSIS

### A.    Standard of review

"We review de novo a district court's denial of a defendant's motion for summary judgment on qualified immunity grounds." *Raimey v. City of Niles*, 77 F.4th 441, 446–47 (6th Cir. 2023) (quoting *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 565 (6th Cir. 2013)). "Qualified immunity shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights." *Id.* at 447 (quoting *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)). "At summary judgment, a government official is entitled to qualified immunity unless the evidence, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that '(1) the defendant violated a constitutional right; and (2) the right was clearly established.'" *Id.* (quoting *Quigley*, 707 F.3d at 680–81). "We view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in his favor." *Id.*

### B.    Jurisdiction

We have jurisdiction over appeals from final decisions of the district courts. 28 U.S.C. § 1291.    Interlocutory appeals from the denial of qualified immunity at the summary-judgment stage are considered "final decision[s]" within the meaning of 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). "This jurisdiction, however, is limited:  circuit courts can review a denial of qualified immunity only 'to the extent that it turns on an issue of law'—the appeal cannot be from a district court's determination that there is a genuine dispute of material fact." *Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016) (quoting *Mitchell*, 472 U.S. at 530). "The effect of this limitation is that the defendant appealing a denial of qualified immunity must concede the plaintiff's facts." *Id.* We may "decide the legal question of whether qualified immunity is warranted based on the facts as found by the district court, taken in the light most favorable to [the Estate]." *Raimey*, 77 F.4th at 448.

No. 24-3311                 *Wiertella v. Lake Cnty., Ohio, et al.*                 Page 6

## C.    Qualified immunity

To overcome Snow's and Watson's qualified-immunity defense, the Estate must establish (1) that Snow and Watson violated Wiertella's constitutional rights, and (2) that the governing caselaw "clearly established" the violation. *See Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 925 (6th Cir. 2024).

In *Lawler*, this court recognized that an Eighth Amendment failure-to-protect claim arising from conduct occurring before 2021 is governed by *Farmer v. Brennan*, 511 U.S. 825 (1994). *Id.* at 927–28. *Farmer*'s first element is satisfied if the plaintiff proves that the inmate had an objectively "serious medical need[]." *Id.* at 928 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Snow and Watson do not dispute that the Estate satisfied this element. Wiertella had several conditions that had been "diagnosed by a physician as mandating treatment." *See Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004)). The first requirement of *Farmer* has therefore been met.

*Farmer* next requires the plaintiff to prove that "[the] officer knew of the facts creating the substantial risk of serious harm," that "the officer believed that this substantial risk existed," and that "the officer 'responded' to the risk in an unreasonable way." *See Lawler*, 93 F.4th at 929 (quoting *Farmer*, 511 U.S. at 844).

Watson testified that she was aware that Wiertella had been booked without his medications, that he was on medications that needed to be continuously administered, and that these medications were classified as "essential" under the Jail's policies. She stated that heart disease, high blood pressure, diabetes, severe sleep apnea, and depression are all serious medical conditions. Watson also considered medications for diabetes, heart disease, high blood pressure, and psychiatric disorders to all be essential medications. She further acknowledged the importance of taking  medications for serious medical conditions because the failure to take those medications could lead to serious harm or even death.

Finally, Watson recognized the general principle that the medical staff should intervene sooner rather than later. She expressly said that she had sometimes been concerned that inmates at the Jail were not getting their blood-pressure medicine in a timely manner.

In light of the above testimony, the district court properly concluded that Watson was aware of a substantial risk to Wiertella if he did not timely receive his essential medications. Yet Watson did nothing to ensure that Wiertella received his blood-pressure medications—or any medication other than for his diabetes—in a timely manner. This was unreasonable.

With regard to Snow, she was responsible as the medical coordinator for making sure that every inmate's medical-screening form was reviewed. She was also responsible for making sure that all the sick calls were set up correctly. Snow was not merely an administrator; she also performed the same duties as the other nurses, such as addressing the daily medical needs of inmates. Further, Watson testified that she believed that Snow had seen Wiertella. Snow disputed this fact, but we must view the evidence in the light most favorable to the Estate.

A jury could thus find that Snow was aware that Wiertella had been booked without "essential medications" that needed to be continuously administered. Snow testified that untreated high blood pressure can cause a substantial risk of harm to patients and that, if an inmate identified a need for high-blood-pressure medication, "it would be something that would need to be addressed as soon as possible." Based on the above evidence, a jury could find that Snow was aware of the substantial risk that Wiertella faced, and that she unreasonably failed to ensure that Wiertella timely received all his essential medications.

To prove that Wiertella faced a "substantial risk of serious harm," the Estate does not have to establish that Wiertella faced a substantial risk of dying within one week. The dissent argues that, since "less than 0.5% of those with high blood pressure suffer an associated death . . .[, i]t follows that even a three-week deprivation of blood-pressure medication does not pose an objectively serious risk of harm, absent further evidence of another serious underlying medical condition." Dissenting Op. at 14–15. But Wiertella informed the prison staff that he had several serious underlying medical conditions besides high blood pressure, including heart disease, diabetes, sleep apnea, and depression.

Moreover, a plaintiff can suffer serious harm without dying. For example, if the medical staff refuses to clean a prisoner's wound, this can constitute serious harm even if the wound later heals. *See Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991). If an inmate experiences

symptoms of depression because he is not timely receiving his psychiatric medication, this can constitute serious harm. *See Richmond v. Huq*, 885 F.3d 928, 942–43 (6th Cir. 2018). An inmate who "suffers pain needlessly" has suffered serious harm. *Boretti*, 930 F.2d at 1154–55. And the "interruption of a prescribed plan of treatment could constitute a constitutional violation." *Id.* at 1154. Wiertella suffered the symptoms of untreated high blood pressure, heart disease, sleep apnea, and depression because his prescribed plan of treatment for all these conditions was unnecessarily interrupted.

In establishing its § 1983 claim, the Estate concedes that it is required to "identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *See Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)). The Estate cited, and the district court extensively analyzed, similarities between this case and *Richmond*. Richmond's medical records indicated that she had been taking psychiatric medications before she arrived at the Wayne County Jail. *Richmond*, 858 F.3d at 935–36. This court held that her treating doctor at the jail had an obligation to take reasonable steps to ensure that Richmond timely received her medications. *Id.* at 942. These steps could have included the doctor prescribing the medications herself or requesting that a nurse verify Richmond's prior prescriptions. *Id.* Waiting for Richmond to have her psychiatric conditions addressed at an upcoming psychiatrist appointment scheduled 14 days later was not deemed sufficient to address her serious medical needs. *See id.* at 935, 941–43.

The dissent argues that Watson's conduct was not "so cursory as to amount to no medical treatment at all" because she scheduled Wiertella for a sick call. Dissenting Op. at 15 (citing *Helphenstine v. Lewis County,* 60 F.4th 305, 322 (6th Cir. 2023)). But there is no evidence that Watson was the nurse who initially added Wiertella to the sick-call log. And even if she was, having Wiertella wait a full week to have several serious medical conditions addressed was unreasonable.

This case is distinguishable from cases like *Jones v. Martin*, 9 F. App'x 360 (6th Cir. 2001) (order), relied on by the dissent. Dissenting Op. at 18. Jones suffered blackouts after running out of his blood-pressure medication, but he was unable to establish that the prison

Case: 24-3311    Document: 24-2    Filed: 06/24/2025    Page: 9

No. 24-3311                    *Wiertella v. Lake Cnty., Ohio, et al.*                    Page 9

doctor intentionally denied him the medication or unreasonably delayed treatment. *Id.* at 362. Snow and Watson, in contrast, were aware that Wiertella had been taking several essential medications for serious medical conditions, and they knew that he did not have access to these medications in the Jail. Yet they intentionally chose not to provide those medications in a timely manner.

This court in *Richmond*, moreover, held that prior caselaw had clearly established that "neglecting to provide a prisoner with needed medication" could "constitute a constitutional violation." *Id.* at 948. *Richmond* thus presents a "similar fact pattern" that gave Snow and Watson a "fair and clear warning" that failing to ensure that Wiertella timely received his essential medications was a violation of his constitutional rights under the Eighth and Fourteenth Amendments. *See Arrington-Bey*, 858 F.3d at 993. The district court therefore did not err in concluding that Snow and Watson were not entitled to qualified immunity as a matter of law.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the decision of the district court and **REMAND** the case for further proceedings on the Estate's § 1983 claim.

No. 24-3311                    *Wiertella v. Lake Cnty., Ohio, et al.*                    Page 10

---

### DISSENT

---

CHAD A. READLER, Circuit Judge, dissenting.  Treating incarcerated patients presents unique challenges for medical professionals.  Especially so in the jail setting, where rapid turnover of detainees further complicates the effort to address medical needs.  *See* Zhen Zeng & Todd D. Minton, Bureau of Just. Stats., *Census of Jails 2015–2019 – Statistical Tables* 31 (Oct. 2021) (noting that the average detainee spends just 23 days in jail).  As a legal matter, the Constitution's due process guarantee is a poor fit for setting appropriate boundaries for treating these detainees.  *See Brawner v. Scott County*, 14 F.4th 585, 610 (6th Cir. 2021) (Readler, J., concurring in part and dissenting in part); *Helphenstine v. Lewis County*, 65 F.4th 794, 801 (6th Cir. 2023) (order) (Readler, J., statement respecting denial of rehearing en banc).  But if we must deploy due process notions here, we owe it to medical professionals to articulate clear guideposts governing their conduct.

Congress has signaled as much by implicitly incorporating the common law defense of qualified immunity into 42 U.S.C. § 1983.  *Wyatt v. Cole*, 504 U.S. 158, 163–64 (1992); Scott Keller, *Qualified and Absolute Immunity at Common Law*, 73 Stan. L. Rev. 1337, 1342 & n.19, 1358 (2021).  At common law, history suggests, that defense required "clear evidence of subjective improper purpose."  Keller, *supra*, at 1377; *cf. Baxter v. Bracey*, 140 S. Ct. 1862, 1864 (2020) (Thomas, J., dissenting from the denial of certiorari) (advocating return to common law basis for qualified immunity).  Our modern qualified immunity test, although perhaps less rigorous in comparison, still adheres to similar notice principles.  Before a plaintiff may overcome an assertion of qualified immunity, he must show that a defendant violated "clearly established" constitutional law.  *Wyatt*, 504 U.S. at 166; *see also Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (explaining that liability arises only where "existing precedent" places the "constitutional question beyond debate") (citation omitted)).  By requiring that the rule at issue be clearly established, we ensure that a defendant may be sued only for conduct that "every reasonable official would have understood" to violate legal boundaries, thus

No. 24-3311          *Wiertella v. Lake Cnty., Ohio, et al.*          Page 11

limiting liability to the "plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 743 (2011) (citations omitted).

Yet all too often, we define "clearly established" rights in such broad fashion that notions of predictability become little more than an afterthought. *See Colson v. City of Alcoa*, No. 20-6084, 2021 WL 3913040, at *8, *10 (6th Cir. Sept. 1, 2021) (Readler, J., dissenting). This case is a good example. After unearthing a constitutional violation from a factual record that supports none, the majority opinion finds a clearly established right in precedent that supplies little more than debate. Employing such loose legal standards is problematic enough for defendants Christina Watson and Diane Snow. But it is especially worrisome when viewed across the medical profession. In 2019, ten million detainees (like Randy Wiertella) were housed in jails. Zeng & Minton, *supra*, at 41. As roughly one-fifth of those jails provide on-site medical treatment, *id.* at 43, jail-based medical personnel likely encounter about two million detainees annually. With each interaction giving rise to the risk of constitutional liability, it becomes all the more critical that judges articulate concrete standards for those medical professionals to follow. Nor may we impose liability when those clear markers have not been crossed. Today, we fall well short of honoring those settled obligations.

I.

The facts tell an admittedly tragic tale. At the start of what was scheduled to be a nearly month-long period of detention in jail, Randy Wiertella completed a medical screening form indicating that he was "on medication which should be continuously administered," and that his conditions requiring medication included diabetes, heart disease, high blood pressure, and psychiatric disorders. The form, however, did not identify Wiertella's specific prescriptions. Nurse Christina Watson reviewed and signed the form.

The next day, following Wiertella's request for "diabetic, and other meds," Watson ordered a diabetes medication called metformin, which Wiertella received. At some point, she also made Wiertella an appointment with another nurse (dubbed "sick call") in about a week's time for the purposes of checking blood pressure, discussing his lack of "meds," and "sign[ing a] release." R. 64, PageID 2835, 2873–74. Regarding the last notation, Wiertella's pharmacy

No. 24-3311                *Wiertella v. Lake Cnty., Ohio, et al.*                Page 12

would not verify his prescription information without a release form signed by Wiertella. Wiertella made two subsequent written requests through the jail's administrative channels. In those materials, he for the first time listed the names of his other medications. Watson, all agree, never received those requests. Nor did she ever examine Wiertella or receive any other information indicating a risk of a looming hypertensive crisis.

The morning Wiertella was supposed to be seen for his sick call, he was found dead, having died from a heart attack caused in part by his lack of medication. His estate sued Watson and nurse Diane Snow, Watson's supervisor, for deliberate indifference under the Eighth and Fourteenth Amendments. The district court denied the two qualified immunity, a decision they now appeal.

## II.

To overcome the nurses' assertion of qualified immunity, Wiertella must show both that the two violated the Constitution and that the violation was clearly established. *Fisher v. Jordan*, 91 F.4th 419, 424 (6th Cir. 2024). At step one, this case is governed by *Farmer v. Brennan*, 511 U.S. 825 (1994). Thus, Wiertella must demonstrate that he suffered from an objectively serious risk of harm which the nurses, at the very least, consciously disregarded. *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 928–30 (6th Cir. 2024). At step two, he must provide existing precedent showing "beyond debate" that each nurse violated the law. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam). Doing so demands that he cite "a case with facts similar enough that it squarely governs this one, what amounts to on-point caselaw that would bind a panel of this court." *Moore v. Oakland County*, 126 F.4th 1163, 1167 (6th Cir. 2025) (citation modified). Wiertella has met neither burden.

The interlocutory posture of this appeal, I recognize, typically limits us from reaching purely fact-bound issues the nurses might raise in an ordinary summary judgment appeal. *Id.* But "legal questions"—such as what conduct violates the Eighth and Fourteenth Amendments and which violations have been clearly established—are fair game. *Id.* So is the question "whether a reasonable jury could believe an assertion of fact blatantly contradicted by the

No. 24-3311                    *Wiertella v. Lake Cnty., Ohio, et al.*                    Page 13

record." *Id.* (cleaned up). Wiertella's failure to satisfy each qualified immunity hurdle falls easily within these categories.

A. Take first the absence of any constitutional violation. This case, like so many in this setting, hinges on the nurses' state of mind. *See Lawler*, 93 F.4th at 929. Even accepting the facts in his favor, Wiertella fails to show that either nurse consciously disregarded any risk he faced. *See Farmer*, 511 U.S. at 839. The overarching question of "conscious disregard" breaks down into three smaller ones: (1) Did the nurses know the facts that created the risk to Wiertella? (2) If so, did they also interpret those facts to conclude for themselves that the risk existed? And (3) if so, was their response to this known risk reasonable? *Lawler*, 93 F.4th at 929–30. We must be careful not to dilute this standard. That warning bears emphasis, as our Court has all too often premised liability on what an official *should* have known rather than what she *did* know. *See Brawner v. Scott County*, 18 F.4th 551, 554 (6th Cir. 2021) (order) (Readler, J., dissenting from the denial of rehearing en banc) (canvassing cases). *Farmer*, however, was unequivocal: Wiertella needs evidence that the nurses had "actual knowledge of [his] risk[]" and still proceeded to disregard it. 511 U.S. at 842. He has no such evidence.

1. Begin with Watson. To the majority opinion's eye, "Watson was aware of a substantial risk to Wiertella if he did not timely receive his essential medications." Maj. Op. 7. But what does "timely" mean to those in the majority? In other words, did Watson fail to respond to a risk of immediate harm during the week between when she reviewed Wiertella's information and when he was scheduled for sick call? Or was it instead a risk of harm at some later point? The majority opinion does not say. Either way, Watson did not consciously disregard any risk to Wiertella.

a. There is no evidence that Watson was aware of the risk of immediate harm to Wiertella. The district court, for its part, made no findings to that end. *See DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015). The majority opinion's circumstantial evidence of Watson's knowledge fares no better, especially when measured against *Farmer*'s yardstick for when circumstantial evidence "could be sufficient" to prove actual knowledge—namely, when the risks were "longstanding, pervasive, well-documented, or expressly noted by prison officials

in the past" and the defendant "had been exposed to information concerning the risk" such that she "must have known of it." 511 U.S. at 842.

The majority opinion first emphasizes that Watson knew Wiertella was on medication that needed to be continuously administered, yet was booked without all of his medications. Maj. Op. 6–7. But knowing Wiertella needed *some* medication to be continuously administered does not show that Watson thought any medications besides metformin (his diabetes drug) fit in this category. The screening form does not state which medications were needed continuously. And according to Watson, she interpreted this entry to refer only to metformin. R. 59, PageID 1268 (Watson identifying diabetes medication as the only concern needing to be taken care of "at that time"). None of this indicates that Watson "must have known" Wiertella might suffer harm within the week if other medications were not administered immediately. *Farmer*, 511 U.S. at 842.

True, as the majority opinion notes, *see* Maj. Op. 6, Watson acknowledged that it is "important to be compliant with [essential] medications" because "there can be serious medical consequences" otherwise, sometimes including serious harm or death. R. 59, PageID 1252–53. Those points are unassailable. But so is the fact that a general awareness of risk "[i]n some situations," *id.*, falls far short of showing Watson subjectively concluded that an immediate, within-the-week risk existed here with respect to Wiertella's heart condition. *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 944 (6th Cir. 2022) (noting that general "knowledge of something 'suspicious' is not akin to demonstrating awareness of a specific risk").

That high blood pressure, Wiertella's primary non-diabetes complaint, is both highly prevalent and relatively benign in most cases only bolsters the point. Roughly half of adults in America—120 million—suffer from high blood pressure, and about half of them treat it with medication. Cheryl D. Fryar et al., U.S. Ctrs. for Disease Control & Prevention, *Hypertension Prevalence, Awareness, Treatment, and Control Among Adults Age 18 and Older: United States August 2021–August 2023*, at 1, 3 (2024). Yet on an annual basis, less than 0.5% of those with high blood pressure suffer an associated death. *High Blood Pressure*, CDC (Jan. 3, 2025), https://perma.cc/5QGA-FLPD. It follows that even a three-week deprivation of blood-pressure medication does not pose an objectively serious risk of harm, absent further evidence of another

No. 24-3311                  *Wiertella v. Lake Cnty., Ohio, et al.*                  Page 15

serious underlying medical condition. *See Jackson v. Pollion,* 733 F.3d 786, 787–90 (7th Cir. 2013) (Posner, J.) (surveying a large amount of medical research). While the nurses do not contest the objective element, what is true there applies with greater force in determining what risk they could have perceived from reviewing the skeletal information on Wiertella's screening form. In doing so, Watson had little reason to conclude that Wiertella would be the rare hypertensive patient to suffer serious harm. And, more to the point, she had absolutely no basis to conclude he might suffer such harm within a week.

The majority opinion responds that "a plaintiff can suffer serious harm without dying." Maj. Op. 7. Very true. Perhaps, as the majority opinion suggests, "the symptoms of untreated high blood pressure, heart disease, sleep apnea, and depression" qualify as "serious harm." *Id.* And perhaps "Wiertella suffered the[se] symptoms" prior to the fatal event, although the majority opinion's conclusion to that effect includes no record citation, and thus is pure speculation. *Id.* Even so, the question on the subjective prong is not what we know happened to Wiertella in hindsight but whether Watson concluded that he faced these "specific risk[s]" within a week. As just explained, she did not.

b. As to whether Wiertella might suffer serious harm at a future point if he did not receive his medication, all agree that Watson was aware of this risk. And she responded reasonably by scheduling Wiertella for sick call. In evaluating Watson's response, we may not "second guess medical judgments" she made regarding Wiertella's "treatment," even if that treatment was "inadequate." *Richmond v. Huq,* 885 F.3d 928, 939 (6th Cir. 2018) (citation omitted). It follows that in cases that do not involve "a complete denial of medical care," *id.*, we will not hold a medical professional liable unless she acted in a way "so grossly incompetent . . . as to shock the conscience," or offered treatment "so cursory as to amount to no medical treatment at all." *Helphenstine v. Lewis County*, 60 F.4th 305, 322 (6th Cir. 2023) (citations omitted).

That does not describe Watson's actions. Again, she scheduled Wiertella for sick call. The majority opinion, I note, concludes that "there is no evidence" of Watson taking that step. Maj. Op. 8. But Snow testified that the "writing" in the sick-call log "is Christina [Watson]'s,"

R. 64, PageID 2860, a fact Wiertella concedes, Appellee Br. 22 ("Watson . . . scheduled a sick visit eight days after Wiertella was booked.").

Watson's handwritten notes identified three purposes for the appointment: check "BP" (that is, blood pressure), "[no] meds," and "sign [pharmacy] release." R. 64, PageID 2835, 2873–74. These notations show that Watson scheduled the sick call specifically in response to Wiertella's lack of medication—especially blood pressure medication. Doing so neither "shock[s] the conscience" nor "amount[s] to no medical treatment at all." *Helphenstine*, 60 F.4th at 322 (citations omitted).

That is especially true when one considers that Watson, like all medical personnel, is subject to "the unhappy truth that, when vital resources are limited, some will not get what they need, at least not right away." Ken Kipnis, *Triage and Ethics*, 4 Am. Med. Ass'n J. Ethics 19, 19 (2002). That well describes the jail setting, where detainees come and go, often in unpredictable ways. *See generally* Zeng & Minton, *supra*. As a result, when faced with a patient who, like Wiertella, presents a constellation of potential issues, Watson had to "perform a preliminary assessment . . . to determine the nature and degree of urgency of treatment required," a process otherwise known as "triage." *Triage*, Oxford English Dictionary, https://perma.cc/MX6L-C8EJ. Doing so involves balancing the urgency of intervention with the resources needed to treat relevant conditions. *See* Emergency Nurses Ass'n, *Emergency Severity Index Handbook* 5 (5th ed. 2023); Rhonda Gay Hartman, *Tripartite Triage Concerns: Issues for Law and Ethics*, 31 Critical Care Med. S358, S358 (Supp. 2003) (noting that triage decisions necessarily require "human judgment").

As lay people, we judges may not "second guess [these] medical judgments," even if we believe they led to "inadequate . . . treatment." *Richmond*, 885 F.3d at 939 (citation omitted). That includes Watson's medical judgments underlying her triage decisions. After reviewing Wiertella's screening form and related requests, she determined a course of action. She began by doing "what [she] was trained to do," namely "to pull out the . . . most important" condition. R. 70-8, PageID 4025. For Wiertella, that was his "diabet[es]." *Id.* With respect to other conditions noted on the screening form, Watson "personally ma[d]e [the] decision[]" to "have [Wiertella] come for sick call." *See id.*, PageID 3995. In doing so, she relied on her medical

training, which taught her to "mak[e] the judgment calls [regarding] who needs to be seen" in "sick call." *Id.*, PageID 3986.

Given the circumstances, what more could Watson have done?  Wiertella's screening form did not provide medicine names or doses.  Watson never received the forms that did identify that information.  And calling Wiertella's pharmacy would have been met with a request for his signed release form, which Watson did not possess.  As a result, her lone option for addressing those omissions was to schedule Wiertella for sick call, where he could give needed information to a nurse or sign the release allowing his pharmacy to do so.  *Cf. Mullins v. Kalns*, 234 F.3d 1269, 2000 WL 1679511 (6th Cir. 2000) (unpublished table decision) (order) (nurses responded reasonably to risk from one-weekend-long lack of blood pressure medication when they took all steps possible to obtain it).  Perhaps Watson could have scheduled that appointment sooner, although limited jail resources may have dictated otherwise.  Either way, that fact alone does not make Watson's decision grossly incompetent, or so cursory as to amount to no treatment at all.  *Helphenstine*, 60 F.4th at 322.  Especially so, again, when Watson perceived no risk of immediate harm to Wiertella.  At worst, Watson acted "carelessly or inefficaciously" by not scheduling Wiertella sooner, a "degree of incompetence which does not rise to the level of a constitutional violation." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

Our precedent bears this out.  We consistently refuse to hold medical personnel liable for triage decisions regarding treatment even if a different decision would have prevented some ill effect.  Consider, for example, *Griffith v. Franklin County*.  There, two nurses received urinalysis results indicating that an inmate had an acute kidney injury, which typically dictates hospitalization.  975 F.3d 554, 563 (6th Cir. 2020).  Deploying their independent medical judgment, however, the nurses "weren't that alarmed" by the data but "did want it reviewed." *Id.* As a result, they forewent hospitalization and instead scheduled the inmate to be seen by another nurse during her next weekly visit.  Before being seen, the inmate suffered multiple seizures tied to acute renal failure. *Id.* at 564–65.  In awarding the nurses qualified immunity, we honored their "independent evaluation as to whether to place the inmate on medical observation" or take other action—in other words, their triage judgment. *Id.* at 572.  So too here, where Watson

determined that Wiertella's need for medication besides metformin could wait for consultation days later.

*Griffith* does not stand alone. Circuit decisions refusing to second-guess a medical professional choosing one treatment over an earlier or different treatment abound. *See Rouster v. County of Saginaw*, 749 F.3d 437, 443–44, 449 (6th Cir. 2014) (decision not to notify on-call physician of vomiting and bizarre behavior by inmate and instead to place the inmate under medical observation); *Jackson v. Gibson*, 779 F. App'x 343, 344, 348 (6th Cir. 2019) (decision not to treat or medicate inmate's foot injury and instead to schedule for an appointment with a prison doctor); *VanNortwick v. Stewart*, No. 21-2739, 2022 WL 1494538, at *2–3 (6th Cir. May 12, 2022) (decision not to hospitalize inmate and instead to arrange for further testing and later follow up by a colleague); *Britt v. Hamilton County*, No. 21-3424, 2022 WL 405847, at * 4 (6th Cir. Feb. 10, 2022) (decision not to take inmate's vital signs and instead to await physician's instructions); *Bowles v. Bourbon County*, No. 21-5012, 2021 WL 3028128, at *9 (6th Cir. July 19, 2021) (decision not to hospitalize inmate who was "in obvious pain, beating his head with his fists, and throwing up in a bucket" and instead to await superior's instructions). Like each of these medical professionals, Watson used her medical judgment to make a reasonable treatment decision, leaving us little basis to conclude that she wholly disregarded Wiertella's risk of harm from not having his medications.

On a more granular level, allegations that jail staff "failed to provide [an inmate] with . . . blood pressure medicine during the first few days of his stay in the county jail" are by no means novel in our circuit. *Reed v. Gill*, 205 F.3d 1341, 2000 WL 194146, at *1 (6th Cir. 2000) (unpublished table decision) (order). Yet we routinely refuse to hold medical providers liable for that delay, even if it results in harm. *Id.*; *Jones v. Martin*, 9 F. App'x 360, 362 (6th Cir. 2001) (order) (holding that "lapse in [blood pressure] medication" through failure to refill prescriptions twice was not deliberate indifference, even though inmate suffered black-outs as a result); *Carpenter v. Wilkinson*, 205 F.3d 1339, 2000 WL 190054, at *1 (6th Cir. 2000) (unpublished table decision) (describing the allegation that prison officials "violated [the inmate's] Eighth Amendment rights by not timely providing him with medication for high blood pressure" as mere "difference of opinion regarding treatment").

No. 24-3311                    *Wiertella v. Lake Cnty., Ohio, et al.*                    Page 19

Ours is not a minority view. When our sister circuits face similar lack-of-blood-pressure-medicine claims, they too bless treatment decisions like Watson's, to say nothing of treatment decisions that are even less comprehensive. *See, e.g., Jackson,* 733 F.3d at 787 (no liability for three-week delay); *Lindwurm v. Wexford Health Sources, Inc.*, 84 F. App'x 46, 48 (10th Cir. 2003) (order) (no liability for "isolated and brief" "lapses in [providing blood pressure] medication"); *Pandey v. Freedman*, 66 F.3d 306, 1995 WL 568490, at *2 (5th Cir. 1995) (unpublished table decision) (per curiam) (no liability for providing wrong blood pressure medication four days late); *see also Duncan v. Corr. Med. Servs.*, 451 F. App'x 901, 905 (11th Cir. 2012) (per curiam) (noting that "an isolated instance where [the inmate] had not received proper [blood pressure] medication and then suffered a medical emergency" would "clearly" support "no showing of deliberate indifference"). Reflective of this seemingly uniform approach is the Eighth Circuit's decision in *Fourte v. Faulkner County*. There, an inmate "submitted a medical form complaining of high blood pressure and asking jail staff to call two family members who could get his 'meds,'" yet did not receive any treatment (besides monitoring of his ever-increasing blood pressure) until his blood pressure reached the "emergency level" of "180/121" 27 days later. 746 F.3d 384, 386–87 (8th Cir. 2014). Even then, the jail nurse who provided the emergency medication waited another week to schedule the inmate for an appointment—despite the fact he now also complained of vision loss and would eventually go blind—at which point he finally received a blood pressure prescription. *Id.* In evaluating these treatment decisions, the Eighth Circuit concluded that the providers at most "should have known they were committing malpractice," but were not deliberately indifferent. *Id.* at 389. Watson's conduct pales in comparison.

Eschewing this long line of authority, the majority opinion instead creates a circuit split. Indeed, deeming Watson's purported mistreatment as anything more than mere negligence is out of step with circuits across the land. At most, those courts find liability only when the deprivation of blood pressure medication is, unlike here, repeated, prolonged, intentional, or accompanied by overt signs of an impending and serious hypertensive crisis. *See Duncan*, 451 F. App'x at 903–05 (liability for depriving inmate of three different heart medications for periods totaling 22 days, 210 days, and 46 days respectively, despite his repeated requests and trips to the emergency room with chest pain); *Carter v. Broward Cnty. Sheriff's Off.*, 710 F. App'x 387, 392

No. 24-3311                    *Wiertella v. Lake Cnty., Ohio, et al.*                    Page 20

(11th Cir. 2017) (per curiam) (liability for "regularly" denying medication for five months, despite inmate complaints and symptoms); *King v. Busby*, 162 F. App'x 669, 671 (8th Cir. 2006) (per curiam) (liability for depriving inmate of medication "half the time," including at least 26 identified occasions, over seven months); *Haltiwanger v. Mobley*, 230 F.3d 1363, 2000 WL 1371098, at *1 (8th Cir. 2000) (unpublished table decision) (per curiam) (liability for "periodically" refusing to give inmate blood pressure medication in retaliation for spurning nurse's sexual advance).

The majority opinion, regrettably, stands alone. As we have held in *Reed*, *Jones*, and *Carpenter*, and as other circuits agree, Watson did not consciously disregard any risk to Wiertella.

2.a. As for Snow, she never perceived any risk to Wiertella whatsoever, similarly absolving her of liability. All that Wiertella has mustered on this point is the possibility, identified by the district court, that his screening form was placed on a shelf for Snow to review. But the district court's assumption "blatantly contradict[s] . . . the record, so that no reasonable jury could believe it." *DiLuzio*, 796 F.3d at 609 (citation omitted).

We "are able to fix obvious factual errors" as part of our interlocutory review. *Bey v. Falk*, 946 F.3d 304, 322 (6th Cir. 2019). That is the case here, where the district court blatantly erred in concluding that Wiertella's screening form could have been presented to Snow. *See id.* As an initial flaw, the district court appeared to invert the burden of production at summary judgment. It faulted Snow for "not provid[ing] any evidence that Mr. W[ie]rtella's file was not placed on [her] shelf for review." *Wiertella v. Lake County*, No. 20-CV-2739, 2024 WL 1282715, at *13 (N.D. Ohio Mar. 26, 2024). But it was Wiertella's duty to provide evidence demonstrating Snow *did* review the form. *See Burwell v. City of Lansing*, 7 F.4th 456, 467–69 (6th Cir. 2021) (affirming summary judgment for nurse who "did nothing to assess" inmate she saw "lying motionless on the ground" because "the record [wa]s insufficient" to show she "had [any] reason to suspect" the inmate was suffering from a drug overdose).

In any event, on that issue, the record says otherwise. Watson testified that standard protocol dictated that a screening nurse (like Watson) would review the form to look for

No. 24-3311                    *Wiertella v. Lake Cnty., Ohio, et al.*                    Page 21

"issue[s] that the medical . . . department needs to deal with," including "diabetics need[ing] to
have their insulin or their medication." R. 59, PageID 1205–07. Only if this nurse "determined
that there were not medical issues" would the form be placed "into a bin" or "wooden shelf."
*Id.*, PageID 1206–07. Snow then "reviewed [the] med screens that" the screening nurses "put
into the wooden folder" to determine whether the inmate needed his once-yearly physical. *Id.*,
PageID 1208–09. But if a form was not placed there, it customarily was not reviewed by
Snow. One jail lieutenant, I recognize, described Snow as "responsible [for] mak[ing] sure that
all of the inmate medical screens are reviewed." R. 60, PageID 2100. As Watson explained,
however, that responsibility was fulfilled by Snow assigning a screening nurse to "look over and
sign" each form. R. 59, PageID 1204.

     Read together, this testimony confirms that a screening nurse would not place a form like
Wiertella's—which indicated that he had significant medical issues like diabetes—on Snow's
shelf. The district court's conclusion to the contrary is an "obvious factual error" that deserves
correction. *Bey*, 946 F.3d at 322.

     b. Even if Snow did see Wiertella's form, she would not have perceived any risk to him.
Once again, any attempt to charge Snow with actual knowledge of Wiertella's risk of a cardiac
event relies on circumstantial evidence that she "must have known" about the risk. *Farmer*, 511
U.S. at 842. With respect to the risk of harm in the near term, the majority opinion cites Snow's
testimony that "there are medical situations in which untreated high blood pressure can cause
substantial risk of harm to a patient," and that an inmate's need for blood pressure medication
"would need to be addressed as soon as possible" seemingly to conclude that Snow was aware of
an immediate risk to Wiertella. R. 63, PageID 2730, 2764. A risk, perhaps. But an immediate
one? Snow's statement conspicuously lacks any timeframe as to when a "medical situation[]"
could pose a risk. *Id.*, PageID 2730. What is more, Snow prefaced her statement by clarifying
that she "wouldn't call [the lack of blood pressure medication] emergent," and added that it
should be addressed by "[s]peaking to the individual again, to find out what medication he's on
and, if at all possible, a pharmacy we can contact[,] . . . the quickest way to find out what the[]
[medications] are." *Id.*, PageID 2764. In other words, Snow saw no risk in waiting to provide

No. 24-3311        *Wiertella v. Lake Cnty., Ohio, et al.*        Page 22

blood pressure medicine until medical staff verified the prescription by seeing the inmate in sick call or contacting his pharmacy with a signed release.

Nor is there evidence that Snow knew Wiertella might suffer harm in the future. Again, assuming (contrary to the record) that Wiertella's screening form was placed on her shelf, Snow reviewed those forms only to determine whether the inmate needed a "history and physical" exam—not to determine a course of treatment. R. 59, PageID 1208. Nothing in the record indicates that the shelf had any other purpose or that Snow ever had a role in making treatment decisions based on the forms on her shelf. The screening nurses, not Snow, were responsible for identifying any "issue[s] that the medical . . . department needs to deal with." *Id.*, PageID 1205–07. In short, Snow had no reason to believe that a medical condition listed on a screening form was not being addressed by the screening nurse. Nor was she aware of the fact that Watson had not obtained Wiertella's medications. So Snow never "knew of the facts creating the substantial risk" to Wiertella, and thus could not have subjectively "believed" the "risk existed." *Lawler*, 93 F.4th at 929; *cf. Jackson*, 733 F.3d at 787 (summary judgment on deliberate indifference claim was "so clearly correct as not to require elaboration" where a "nurse practitioner didn't know the plaintiff wasn't receiving his [blood pressure] medication" for a period of three weeks).

Snow's reliance on screening nurses places her in good company. We routinely allow providers to rely on colleagues to provide inmate care without risking liability if the other provider falls short in some respect. *See Rouster*, 749 F.3d at 449 (nurse's reliance on others to observe and supervise inmate); *Griffith*, 975 F.3d at 576 (nurses' reliance on jailers to submit sick slip if inmate needed further attention); *Burwell*, 7 F.4th at 467–69 (nurse's reliance on jailers to perform "cell checks" that would have discovered overdosing inmate); *Est. of Majors v. Gerlach*, 821 F. App'x 533, 547 (6th Cir. 2020) (nurses' reliance on physician orders in lieu of "exercis[ing] their own independent medical judgment"); *VanNortwick*, 2022 WL 1494538, at *3 (doctor's reliance on colleague to check lab results); *cf. Graham ex rel. Est. of Graham v. County of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004) (county's reliance on medical professionals to whom it delegated inmate care); *Dudley v. Streeval*, No. 20-5291, 2021 WL 1054390, at *2 (6th Cir. Feb. 8, 2021) (order) (reliance by administrator with no active role in patient care on medical colleagues). Like each of these medical professionals, Snow was not at fault for relying

No. 24-3311                    *Wiertella v. Lake Cnty., Ohio, et al.*                    Page 23

on other staff to address the conditions listed in the screening forms later placed on her shelf, forms that she reviewed merely for scheduling physicals. All things considered, Snow fairly perceived no risk to Wiertella.

B.1. Assuming the nurses did violate Wiertella's constitutional rights, he fails to show that those acts transgressed clearly established constitutional markers. *Kisela*, 584 U.S. at 104. His effort to do so is tied entirely to our *Richmond* opinion. Yet its value is deeply suspect.

Let's consider the source. *Richmond* authorized a pretrial detainee to sue a doctor, social worker, and two nurses for failing to obtain the detainee's prescribed medication for a period of 17 days. 885 F.3d at 935–36, 940–47. To overcome those defendants' assertion of qualified immunity, Richmond had to show that their actions violated her clearly established rights. Regrettably, our opinion failed to honor that command. *Id.* at 947–48. We began by observing that the right to be free from "deliberate indifference to a prisoner's medical needs" has existed since 1976. *Id.* (citation omitted). This surface-level observation comes nowhere close to resolving all debate over the illegality of the defendants' actions there. *Cf. City & County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015) ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."). Nor, for many of the same reasons, does our spacious observation "that [this] right . . . extends to psychological needs." *Richmond*, 885 F.3d at 947. That leaves one final instruction, that "neglecting a . . . medical need" and "interrupting a prescribed plan of treatment can constitute a constitutional violation." *Id.* at 948. This statement is problematic too. In particular, it offers no "specific context" for when a violation in fact occurs, and thus falls short of extinguishing all "debate" over the constitutional question. *See Rivas-Villegas*, 595 U.S. at 5. After all, merely because something "can" violate the Constitution does not mean that it does so in a given scenario. *Richmond*, 885 F.3d at 948.

Nor do the cases cited by *Richmond* end that debate. Fairly read, the facts of those cases never pass within *Richmond*'s orbit. *See Estelle v. Gamble*, 429 U.S. 97, 99–100 (1976) (discipline of inmate with severe back pain for not joining prison workforce); *Comstock*, 273 F.3d at 704–05 (release of inmate from suicide watch with knowledge he was still at risk of self-harm); *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844 (6th Cir. 2002)

No. 24-3311            *Wiertella v. Lake Cnty., Ohio, et al.*            Page 24

(prescription of heat-stroke-inducing medication to obese-hypertensive inmate during severe heatwave); *Boretti v. Wiscomb*, 930 F.2d 1150, 1151–52 (6th Cir. 1991) (refusal to follow instructions to change inmate's bandage daily). True, *Richmond* did not have to identify a case that was "*directly* on point." *Kisela*, 584 U.S. at 104 (emphasis added). But it did need to cite case law "squarely govern[ing]" the facts, *Moore*, 126 F.4th at 1167, such that it was "beyond debate" that waiting two weeks to verify a prescription runs afoul of the Constitution, *Kisela*, 584 U.S. at 104. It failed to do so.

Adding all of this together, *Richmond*'s deep flaws give it little precedential value. Especially so when "intervening Supreme Court decision[s]" provide contrary "legal reasoning" that is "directly applicable" to those shortcomings—a situation that "gives us the right to revisit [the] question" *Richmond* decided. *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 720 (6th Cir. 2016); *see, e.g.*, *Kisela*, 584 U.S. at 104–05 (rebuking court of appeals for "defin[ing] clearly established law at a high level of generality" without making "the right's contours . . . sufficiently definite" in a case decided one month after *Richmond*); *see also Colson v. City of Alcoa*, 37 F.4th 1182, 1190 (6th Cir. 2022) (granting qualified immunity because previous, flawed "clearly established" analysis was supplanted by subsequent Supreme Court decisions).

2.    Even accepting *Richmond* as controlling, the decision does not "place[] the . . . constitutional question" here—whether the nurses consciously disregarded Wiertella's risk of serious harm—"beyond debate . . . in light of [*Richmond*'s] specific context." *Rivas-Villegas*, 595 U.S. at 5. Back to today's majority opinion. It draws on *Richmond*'s holding that "neglecting to provide a prisoner with needed medication" could amount to a constitutional violation. Maj. Op. 9 (quoting *Richmond*, 885 F.3d at 948). Yet this "broad general proposition" leaves medical personnel with little guidance as to what specific actions violate the law, and thus serves as a poor guide here in assessing what right was clearly established. It likewise ignores *Richmond*'s "specific context," as neither nurse's actions align with anything deemed illegal there. *Rivas-Villegas*, 595 U.S. at 5.

a.    Turn first to Watson. Scheduling Wiertella for sick call is unlike any unlawful act in *Richmond*, which, as our Court has noted, "involved allegations that medical professionals

No. 24-3311                 *Wiertella v. Lake Cnty., Ohio, et al.*                 Page 25

deliberately provided *no* treatment in the face of a known medical issue." *Whyde v. Sigsworth*, No. 22-3581, 2024 WL 4719649, at *5 (6th Cir. Nov. 8, 2024). In *Richmond*, a doctor took no "steps to ensure that Richmond received her medication," thereby violating the doctor's "obligation to offer medical care." 885 F.3d at 942. Nor did the nurses in that case make "any attempt" to get Richmond medication, whether by contacting Richmond's pharmacy or psychiatrist or by "request[ing] that another nurse attempt to do so." *Id.* at 946. The social worker likewise did not act even though he perceived an immediate risk of harm to Richmond, as he knew bipolar, depressed patients like Richmond could "expect the symptoms to return within ten days" of stopping medication. *Id.* at 943. Yet he merely scheduled Richmond to see a psychiatrist 17 days later, failing to address the inherent risk that Richmond's symptoms could return much sooner. *Id.* None of these treaters is like Watson, who responded to the risk she perceived by scheduling Wiertella for sick call within a week.

Any analogy to *Richmond* wanes even further when we consider what Watson knew about Wiertella's medications. Take, for comparison's sake, the social worker. *Richmond* highlighted that the social worker knew the exact medications Richmond was taking (even down to the date of her last dose) and could have obtained those medications immediately after evaluating her. *Id.* at 942. Watson, again, knew none of this, as the forms she received did not indicate the names or doses of Wiertella's other medications. As a result, her delay in the face of this obstacle, especially when she had no reason to fear imminent harm to Wiertella, was not indisputably prohibited by *Richmond*'s censure of a professional who, while alert to the oncoming danger to the inmate and armed with both knowledge of her medications and the ability to acquire them at any time, still failed to act. Put differently, accepting that it is unconstitutional to take no action when an official knows an inmate is missing a specific prescribed medication nonetheless leaves it open for debate whether a nurse can fairly address an inmate's lack of unknown medications by setting an appointment to discuss those medications in a week's time.

b. As to Snow, even if we assume that she reviewed the screening form and perceived a risk to Wiertella after doing so, her non-treating role with respect to those forms negates any comparison to *Richmond*, where each defendant provided Richmond with medical care. *See id.*

No. 24-3311              *Wiertella v. Lake Cnty., Ohio, et al.*              Page 26

at 941 ("Dr. Huq treated Richmond . . . ."); *id.* at 942 ("Myftari diagnosed Richmond . . . ."); *id.* at 946 ("Nurse Fowler examined Richmond . . . ."); *id.* ("Nurse Hawk also had extensive interactions with Richmond . . . ."). Each, in short, was a "medical professional[] responsible for prisoner care." *Graham*, 358 F.3d at 384. But not Snow, who was not responsible for providing day-to-day treatment tied to the forms on her shelf, other than reviewing those forms to assess whether an inmate like Wiertella was due for his yearly physical. In that narrow role, Snow was effectively "an administrator who worked with [Wiertella's] medical providers" but was "not personally involved in making decisions about [his] medical care." *Dudley*, 2021 WL 1054390, at *2. Given this key difference from the *Richmond* defendants, that case does not clearly establish Snow's liability for "rely[ing] on medical judgments made by [the] medical professionals [who were] responsible for prisoner care." *Graham*, 358 F.3d at 384.

If anything, *Richmond* squarely confirms the absence of liability here. In finding no constitutional violation by a second social worker, *Richmond* honored the social worker's "medically reasonable" decision to rely on another provider instead of "personally mak[ing] an effort to verify or secure Richmond's medications." 885 F.3d at 943–44. Like this social worker, Snow was allowed to rely on other medical professionals—including a screening nurse like Watson—to provide Wiertella with appropriate treatment.

Seeing things otherwise, the majority opinion discerns a jury issue as to whether Snow personally provided Wiertella with medical treatment. Maj. Op. 7. That is an unusual point to emphasize when Wiertella himself has never done so. Before the district court, it bears reminding, Wiertella argued that Snow was liable based on (1) reviewing his screening form, (2) playing an "oversight" role "over the sick call process," and (3) serving "as Watson's supervisor." R. 71, PageID 4946–47. And he abandoned all but the first theory on appeal. Appellee Br. 24–25. Nor did he ever cite the evidence the majority opinion relies on here. *See generally* R. 71 (never citing R. 59, PageID 1243); Appellee Br. (same).

Even if we tread where Wiertella did not ask us to go, this evidence creates no jury "disput[e]." Maj. Op. 7. The majority opinion asks us to believe that Watson "testified that she believed Snow had seen Wiertella." *Id.* Not so. Look to the record. In answering whether she

No. 24-3311                 *Wiertella v. Lake Cnty., Ohio, et al.*                 Page 27

had any conversations about Wiertella after his death, Watson gave a rambling answer she summed up by saying, "I honestly don't know":

> No. I mean, there wasn't—no. I mean, I, I can't, I mean, I don't, I don't really believe so, nothing that would jog my memory. So no, I don't, no, I don't think so. It was, I mean, it just was, I remember Diane [Snow], I think, I think she had seen him, but that was about it. I mean, I don't know if I was on, I don't remember what shift I was on at that point in time, so I don't, I honestly don't know.

It is difficult to draw any conclusion from that testimony, let alone the one forcefully drawn by the majority opinion. In the end, no reasonable jury could find that Snow treated Wiertella, and thus knew about his lack of medication, based solely on such "inconclusive" testimony. *See Wooler v. Hickman County*, 377 F. App'x 502, 507 (6th Cir. 2010).

And, even were that not the case, Wiertella is still no closer to showing that Snow transgressed clearly established constitutional limits. If Snow did treat Wiertella, then she would have learned from his chart that he was scheduled for sick call at the end of the week to check his blood pressure and obtain prescription information. This keeps her squarely in line with the second social worker from *Richmond*, who "saw Richmond" in person but still "responded reasonably" by "referring" her to another professional for evaluation. 885 F.3d at 943–44.

*   *   *   *   *

Wiertella's tragic death inevitably tends to color any after-the-fact assessment of the underlying events. But whether a circumstance is tragic is a far different question from whether the facts give rise to a constitutional violation. The rule invented here—that a brief deprivation of a commonplace medication unnecessary to staving off any apparently imminent patient risk runs afoul of the Constitution—diverges wildly from the document's original public meaning, from circuit precedent, and from Supreme Court precedent as well. And the ramifications will be widespread. Consider treatment involving blood pressure medication alone. With one-quarter of adults in the United States taking blood pressure medication, approximately 500,000 such patients are seen by local jail medical staff each year. *See* Fryar et al., *supra*, at 1, 3; Zeng & Minton, *supra*, at 41, 43. Now, in our circuit at least, each of those jailed patients has at his

No. 24-3311                    *Wiertella v. Lake Cnty., Ohio, et al.*                    Page 28

disposal a § 1983 claim if the jail delays in supplying his medication. Bad facts make bad law, indeed.

More to the point, we do not judge medical treaters with the benefit of hindsight. Watson and Snow made their treatment decisions with limited information and resources, a reality faced by many jail medical professionals. Qualified immunity demands that we assess their actions in light of what they knew then, not what we know after the relevant events played out. In a case like this, that means Wiertella needs a record reflecting conscious disregard of a risk to his health and a precedent that stamps out any debate on the question. With both elements absent here, Watson and Snow are entitled to judgment in their favor.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-3311

DENNIS WIERTELLA, as father and administrator of the
estate of Randy Wiertella, deceased,

      Plaintiff - Appellee,

      v.

LAKE COUNTY, OHIO,

      Defendant,

DIANA SNOW, RN; CHRISTINA WATSON, RN, in their
individual and official capacities,

      Defendants - Appellants.

> **FILED**
> Jun 24, 2025
> KELLY L. STEPHENS, Clerk

Before: GILMAN, READLER, and BLOOMEKATZ, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.

THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED, and the case is REMANDED for further proceedings with regard to the estate's § 1983 claim consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_Kelly L. Stephens_

Kelly L. Stephens, Clerk